476 A.2d 11

**In the Interest of Randy Scott MELLOTT, a Minor.**

**Appeal of Randy Scott MELLOTT.**

Superior Court of Pennsylvania.

Argued Nov. 3, 1983.

Filed April 19, 1984.

Kenneth F. Lee, Chambersburg, for appellant.

Merrill W. Kerlin, District Attorney, McConnellsburg, for participating party.

Before WICKERSHAM, WIEAND and CERCONE, JJ.

WIEAND, Judge:

Randy Scott Mellott, a sixteen year old juvenile, was adjudicated delinquent because of a tragic hunting accident in which he accidentally shot and killed another hunter whom he momentarily and mistakenly believed to be a wild turkey. On appeal, he contends that his adjudication hearing was held in violation of Pa.R.Crim.P. 1100. He also contends that an incriminating statement made by him to a deputy game warden, as well as the offending shotgun, should have been suppressed.

■ Appellant's first contention is lacking in merit. Rule 1100 does not apply to juvenile proceedings. Pa.R.Crim.P. 1(a). See: *Commonwealth v. Sadler*, 301 Pa.Super. 228, 233–234, 447 A.2d 625, 627–628 (1982); *Commonwealth v. Jackson*, 287 Pa.Super. 430, 430 A.2d 680 (1981); *Commonwealth v. Mitchell*, 283 Pa.Super. 455, 460–461, 424 A.2d 897, 900 (1981), *cert. denied*, 454 U.S. 851, 102 S.Ct. 292, 70 L.Ed.2d 141; *Commonwealth v. Bell*, 245 Pa.Super. 164, 166, 369 A.2d 345, 346 (1976), *aff'd*, 481 Pa. 229, 392 A.2d 691 (1978). Due process and equal protection arguments have been made with respect to the inapplicability of Rule 1100 to juvenile proceedings and have been rejected. *Commonwealth v. Sadler, supra; Commonwealth v. Jackson, supra.* The court's adjudication in this case is not subject to reversal on Rule 1100 grounds.

The second issue is not so easily resolved. In reviewing the juvenile court's order denying a motion to suppress evidence, we follow established precedent.

[W]e determine whether the record supports the factual findings of the suppression court, as well as determine

the reasonability of any inferences and legal conclusions drawn from the court's findings of fact.... In considering whether the record supports the court's finding of facts we must restrict ourselves to reviewing the evidence presented by the Commonwealth and so much of the evidence for the defense as, fairly read in the context of the record as a whole, remains uncontradicted.

*Commonwealth v. Eliff,* 300 Pa.Super. 423, 428, 446 A.2d 927, 929 (1982) (citations omitted). Accord: *Commonwealth v. Tuck,* 322 Pa.Super. 328, 332, 469 A.2d 644, 646 (1983).

After law enforcement officers learned of the hunting accident, three deputy game wardens and two state policemen went to the scene, where a crowd of persons had already gathered. The state policemen examined the victim of the shooting, and the game wardens performed crowd control duties. Berley Souders, one of the deputy game wardens, asked, "Is the person who done the shooting here?" Two men responded in the affirmative and pointed to Mellott. Souders testified that the crowd seemed to be "gawking" at the juvenile; and, therefore, he told him "Come with me. We will get away from these people. Come on, let's take a walk down. We will talk to you down here." After Mellott had been removed to an isolated spot, Souders asked, "Did you fire the shot?" Mellott responded "Yeah. I was the one that shot." He added that he thought it was a turkey. Souders did not know Mellott and did not then know he was a juvenile. He asked the juvenile for identification. Mellott gave Souders his name but said he had no identification, that his hunting license was with his vest. When asked where that was, he said, "Down by the creek with my gun." Mellott was subsequently advised of his *Miranda* rights, and thereafter accompanied another deputy game warden to retrieve the gun and vest. As a result of further questioning, Mellott gave a detailed, written statement and participated in a re-enactment of the shooting. Everything said by the juvenile after the giving of *Miranda* warnings, however, was suppressed because Mellott had not been given an opportunity to confer with an

interested adult. The suppression court refused to suppress the statements made by the juvenile prior to the *Miranda* warnings. It also refused to suppress the vest and shotgun taken into custody by the game warden. The inculpatory statement made prior to the *Miranda* warnings, as well as the gun and vest, were introduced against Mellott at the adjudication hearing.

Unless a person is advised of his *Miranda* rights prior to custodial interrogation by law enforcement officers in a criminal proceeding, evidence resulting from such interrogation cannot be used against him. *Miranda v. Arizona,* 384 U.S. 436, 444, 478–479, 86 S.Ct. 1602, 1612, 1630, 16 L.Ed.2d 694, 706, 726 (1966). See: *Commonwealth v. Ziegler,* 503 Pa. 555, 470 A.2d 56 (1983); *Commonwealth v. Bracey,* 501 Pa. 356, 366, 461 A.2d 775, 780 (1983); *Commonwealth v. McLaughlin,* 475 Pa. 97, 379 A.2d 1056 (1977); *Commonwealth v. Nunez,* 312 Pa.Super. 584, 459 A.2d 376 (1983); *Commonwealth v. Schoellhammer,* 308 Pa.Super. 360, 454 A.2d 576 (1982). Deputy game wardens are law enforcement officers charged with enforcing the Pennsylvania Game Law.[1] See: *Commonwealth v. Palm,* 315 Pa.Super. 377, 462 A.2d 243 (1983). The Game Law makes it a crime to kill a fellow hunter in mistake. For this offense a maximum sentence of three years imprisonment may be imposed. Act of June 3, 1937, P.L. 1225, as amended, Act of June 23, 1970, P.L. 433, No. 145, § 1, 34 P.S. § 1311.825(c) (supp. 1983–84). There can be no doubt, therefore, that Mellott was being questioned by law enforcement officers in a criminal proceeding.

We are required to use an objective test to determine whether Mellott was subjected to interrogation for *Miranda* purposes. *Commonwealth v. Johnson,* 310 Pa. Super. 385, 392, 456 A.2d 988, 991–992 (1983). "[T]he term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police ... that the police *should know* are *reasonably likely* to elicit an incriminating response from the suspect."

---

**1.** Act of June 3, 1937, P.L. 1225, § 1, 34 P.S. § 1311.1 et seq.

*Id.,* quoting from *Rhode Island v. Innis,* 446 U.S. 291, 301, 100 S.Ct. 1682, 1689–1690, 64 L.Ed.2d 297, 308 (1980). Interrogation includes any questioning calculated to, expected to, or likely to elicit incriminating statements. *Commonwealth v. Bracey, supra; Commonwealth v. Sero,* 478 Pa. 440, 453, 387 A.2d 63, 70 (1978); *Commonwealth v. Davis,* 460 Pa. 37, 40, 331 A.2d 406, 407 (1975).

A subjective test must be applied in order to determine whether Mellott's interrogation was custodial in nature. *Commonwealth v. Meyer,* 488 Pa. 297, 307, 412 A.2d 517, 521 (1980); *Commonwealth v. Brodo,* 262 Pa.Super. 375, 378, 396 A.2d 802, 804 (1979); *Commonwealth v. Anderson,* 253 Pa.Super. 334, 345, 385 A.2d 365, 371 (1978). Custodial interrogation does not require that a formal arrest have been made. Interrogation is custodial if an individual has been "taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning." *Commonwealth v. Bracey, supra* 501 Pa. at 366, 461 A.2d at 780, quoting *Miranda v. Arizona, supra* 384 U.S. at 478, 86 S.Ct. at 1630, 16 L.Ed.2d at 726. See also: *Commonwealth v. Meyer, supra; Commonwealth v. Brodo, supra; Commonwealth v. Anderson, supra* 253 Pa.Super. at 345, 385 A.2d at 370. Our inquiry must be directed to whether Mellott was in a situation in which he reasonably believed that his freedom of action or movement had been significantly restricted. *Commonwealth v. Meyer, supra; Commonwealth v. Brodo, supra; Commonwealth v. Anderson, supra.*

Appellant, knowing that he had killed another person, observed five law enforcement officers arrive at the scene and take charge. When one of them asked who had done the shooting, appellant was identified by persons in the crowd which had gathered. One of the deputy game wardens took him aside, away from the crowd, for questioning. Two other deputy game wardens followed. Appellant, under these circumstances, had reason to believe that his freedom of movement and action had been curtailed. After he had been removed from the crowd, appellant was asked

by Souders: "Did you fire the shot?" This was likely to elicit an incriminating statement. Indeed, that was exactly what happened. We are constrained to conclude, therefore, that appellant's incriminating statement was the product of custodial interrogation.

Mellott was only sixteen years of age. His custodial interrogation was not preceded by any *Miranda* warnings. In addition, the record is clear that he was not accorded an opportunity to consult with an adult who was interested in his welfare. "[J]uvenile defendants are not, in the usual case, on a par with adults with respect to adequacy of their judgment, knowledge [or] the consequences of their admissions and ability to resist overbearing police interrogation." *Commonwealth v. Christmas*, 502 Pa. 218, 221, 465 A.2d 989, 991 (1983). Under these circumstances, Mellott must be presumed to be incompetent to waive his *Miranda* rights without a prior opportunity for consultation with an informed and interested adult. *Id.* There was no evidence from which it could have been found that the juvenile understood his *Miranda* rights or that he was competent to waive them without prior opportunity to consult with an adult.[2]

The juvenile court held that the interrogation of appellant was comparable to a police officer's investigation of an automobile accident. Therefore, the court refused to suppress the juvenile's admission despite the absence of *Miranda* warnings and despite the absence of opportunity to consult with an interested adult. Our review of the evidence leads us inevitably to the conclusion that the order of the suppression court cannot be sustained. Appellant's admission was elicited during interrogation by law enforcement officers after he had become the focus of investigation by law enforcement officers and after he had been deprived of his freedom of action in a significant way. Under these circumstances, appellant's incriminating state-

2. The right to consult with an interested adult is not diminished because the interrogating officer is unaware of the juvenile's age. See: *Commonwealth v. Markle*, 475 Pa. 266, 270, 380 A.2d 346, 348 (1977).

ment was obtained in violation of existing law and should have been suppressed. The adjudication of delinquency, based on an illegally obtained incriminating statement, must be reversed. A new adjudication hearing is necessary.

■ Because of an erroneous determination that Mellott's interrogation had been lawfully conducted, the suppression court did not determine whether the offending weapon and the vest taken by a game warden had been "fruits" of the unlawful interrogation. Upon remand, the court should determine whether the finding of this evidence was attributable to an improper interrogation of the appellant or whether the evidence would have been found irrespective of such interrogation and as a result of a properly conducted investigation. If the evidence was a product of the unlawful interrogation, it must be suppressed. If it would have been found in any event as a result of a lawful investigation by law enforcement officers, the evidence may be used by the Commonwealth. *Commonwealth v. Jones*, 271 Pa.Super. 528, 536, 414 A.2d 379, 383 (1979). See also: *Commonwealth v. Brown*, 470 Pa. 274, 368 A.2d 626 (1976).

Reversed and remanded for proceedings consistent with this opinion. Jurisdiction is not retained.

WICKERSHAM, J., filed a dissenting opinion.

WICKERSHAM, Judge, dissenting:

I would affirm the order of the trial court, Honorable George C. Eppinger, President Judge.

I agree with Judge Eppinger's discussion and conclusion in his opinion filed below, particularly the following:

We perceive three separate time frames in which various incidents occurred on May 2, 1981, which must be considered in the context of the suppression petition and the applicable law. These times frames are:

(1) From the time of the arrival of the deputy game protectors and Cpl. Joyce at the accident scene.

(2) The time when the deputy game protectors learned or should have learned that Randy Scott Mellott was, in fact, a juvenile.

(3) The time period which the juvenile's father was present with the juvenile in the company of the game warden and other deputy game protectors.

When the deputies and Cpl. Joyce arrived at the scene, they were confronted with a dead body and a crowd of people. Their position was analogous to that of the police officer who arrives at the scene of a traffic accident or a crime. One of the deputies addressed the crowd with the question of who had done the shooting, and two individuals pointed to Randy Mellott. To ensure the accuracy of the identification and to avoid any possible interferences or the insertion of irrelevant matters by members of the crowd, the deputy game protector and the juvenile moved away from the other people and into the woods where Deputy Souders sought to confirm the accuracy of the identification. In response to the deputy's question the juvenile affirmed the fact that he had fired the shot because he thought it was a turkey. At this point the deputy sought identification of the juvenile; learned his name; and in response to his request for his hunting license learned that the license was with his vest and gun down by the creek. The juvenile pointed in the direction where his gun and vest were located. After Deputy Souders read the juvenile his rights, he requested the juvenile and Deputy Bergstresser to go pick up the vest and gun so that the license could be examined. The deputy and the juvenile retrieved the vest, gun and an empty shell case and returned to Deputy Souders. The juvenile's hunting license was not in his vest and the deputy was told that the juvenile's father had it. It was at this point in time that Cpl. Joyce advised the deputy game protectors that he had learned that Randy Mellott was a juvenile, and no further questions should be asked until he was in the presence of one of his parents.

In our judgment the questions asked by Deputy Souders during this time frame were equivalent to the questions asked in the preliminary stages of an accident investigation when the investigating officer is simply

attempting to ascertain the basic facts, including the identification of the parties and the whereabouts of the instrumentalities involved; and he had arrived at no conclusion as to whether any violation of the law has occurred. The inquiry whether he fired the shot is analogous to the question whether a party was driving 'that car'. The request for the hunting license is precisely identical to the request for a driver's operator's license and registration card. The juvenile volunteered that his gun was with the vest which he apparently believed had the license attached to it, and he pointed out the direction to the place where he had left vest and gun.

We do not feel that the questions asked by Deputy Game Protector Souders constituted an improper violation of the constitutional rights of the juvenile during this time frame because they were all in the nature of a preliminary investigation of a hunting accident. We feel it was proper for Deputy Bergstresser to take the gun and vest into his possession because they were lying out in the woods and could readily have been stolen by any member of the crowd, and because they might constitute necessary evidence in the ongoing investigation.

Lower ct. op. at 8–11.

I agree. I would affirm.